**KIA MOTORS CORPORATION and Kia Motors America, Inc., Appellants,**

v.

**Lawrence RUIZ (Individually and as Representative of the Estate of Andrea Ruiz), Shenequa Ruiz, Christopher Ruiz, and Suzanna Ruiz, Appellees.**

**No. 05–10–00198–CV.**

Court of Appeals of Texas, Dallas.

Aug. 5, 2011.

Scott P. Stolley, Richard B. Phillips, Jr., Thompson & Knight, L.L.P., Kurt C. Kern, Cary A. Slobin, Bowman and Brooke, LLP, Melissa Anne Dorman, Hartline, Dacus, Barger, Dreyer & Kern, L.L.P., Dallas, for Appellants.

Mary Alice McLarty, The McLarty Firm, P.C., Jeffrey S. Levinger, Hankinson Levinger LLP, Phillip Lee Brown, Eric B. Porterfield, The Brown Law Firm, Dallas, for Appellees.

Before Justices MARTIN RICHTER, LANG, and FILLMORE.

## OPINION

Opinion By Justice MARTIN RICHTER

In this negligent design products liability case, Kia Motors Corporation and Kia Motors America, Inc. ("Kia") challenge the judgment entered upon a jury verdict in favor of Lawrence Ruiz, individually and as representative of the estate of Andrea Ruiz, Shenequa Ruiz, Christopher Ruiz, and Suzanna Ruiz. In six issues, each with multiple sub-parts, Kia asserts it was entitled to a statutory presumption of no liability that was not rebutted, and there is no evidence of negligent design. Kia also challenges the admission and exclusion of evidence and the manner in which jury deliberations were conducted. Finally, Kia asserts the judgment should be re-

versed because of cumulative error. In a cross-point, Ruiz contends the trial court erred in failing to render judgment on the jury's unanimous verdict for exemplary damages. We conclude Kia was not entitled to a presumption of "no liability" and the evidence was legally sufficient to support the jury's finding of negligent design. We further conclude the trial court did not abuse its discretion in the admission or exclusion of evidence. Finally, we conclude the trial court did not abuse its discretion in refusing a jury view or in its monitoring and conduct of the jury during its deliberations. Because there is no error, there is no cumulative error.

With regard to Ruiz's cross-point, because the jury did not unanimously find against Kia on the underlying theory of liability, we conclude the trial court did not err in refusing to award exemplary damages. In light of these conclusions, we affirm the trial court's judgment.

### BACKGROUND

Andrea Ruiz was fatally injured when the 2002 Kia Spectra she was driving was hit head-on by a pick-up truck driven by Harvey Ray Tomlin. When the vehicles collided, the Kia's passenger-side airbag deployed, but the drivers-side frontal airbag did not deploy. Ms. Ruiz's death was caused by two dislocated vertebrae in her neck that resulted from a severe front-to-back movement of her head.

Eight days prior to the accident, Larry Ruiz, Andrea Ruiz's husband, had installed a new radio/cd player in the Kia. After the installation, he noticed that the airbag warning light was illuminated. The warning light remained on until the accident.

Ms. Ruiz's survivors (collectively "Ruiz") sued Kia claiming that the Kia Spectra was defective because the drivers-side frontal airbag failed to deploy in the collision. Ruiz also sued Tomlin for negligence. Following a settlement with Tomlin, Ruiz tried the design defect case against Kia to a jury. Although the design defect was originally plead as both a strict liability and a negligence claim, only the negligence theory was submitted to the jury. After some confusion and four attempts to reach a verdict, the jury found that: (1) Tomlin negligently caused the collision; (2) Kia negligently designed the Spectra; (3) Larry Ruiz was not negligent; (4) Kia was grossly negligent; and (5) responsibility should be apportioned 55% to Tomlin and 45% to Kia. The jury awarded $1,972,000 in actual damages and $2,500,000 in exemplary damages. The trial court accepted the verdict over Kia's objection, and subsequently denied Kia's motion for judgment notwithstanding the verdict ("JNOV"). In the final judgment, the actual damages to be recovered from Kia were reduced by Kia's percentage of responsibility to $887,400. The judgment also awarded Ruiz pre-and post-judgment interest and costs, but the trial court disregarded the jury's gross negligence and punitive damage findings because the jury was not unanimous in finding Kia negligent. This appeal followed.

### DISCUSSION

#### I. *Statutory Presumption*

In its first issue, Kia asserts it was entitled to a statutory "presumption of no liability" because the vehicle complied with government standards for crashworthiness. Kia claims it is entitled to a take-nothing judgment as a matter of law because Ruiz failed to rebut the presumption or obtain jury findings on the issue. Ruiz responds that the presumption of no liability does not apply in this case because the government standards do not govern the product risk that actually caused the harm. Therefore, Ruiz contends he was not required to rebut the presumption. In the

alternative, Ruiz argues that he did rebut the presumption, and thus, there was no presumption issue for the jury to decide.

Although both parties allude to the trial court's pre-trial ruling on Kia's motion for summary judgment as the basis for this alleged error, the parties also reference the trial court's denial of Kia's motion for JNOV. It is well-established that if the trial court denies a motion for summary judgment and the case is tried on the merits, the order denying the summary judgment is not reviewable on appeal. *See Ackermann v. Vordenbaum,* 403 S.W.2d 362, 365 (Tex.1966); *Reese v. Duncan,* 80 S.W.3d 650, 665 (Tex.App.-Dallas 2002, pet. denied). Therefore, we consider the complained-of error in the context of the denial of the motion for JNOV.

We review the denial of a motion for JNOV under a legal sufficiency standard. *See Brown v. Zimmerman,* 160 S.W.3d 695, 702 (Tex.App.-Dallas 2005, no pet.). We review the evidence in the light most favorable to the jury's findings, considering only the evidence and inferences that support them and disregarding all evidence and inferences to the contrary. *See Quaker Petroleum Chems. Co. v. Waldrop,* 75 S.W.3d 549, 553 (Tex.App.-San Antonio 2002, no pet.). If there is more than a scintilla of evidence to support the jury's findings, the motion for JNOV was properly denied. *Id.*

In the motion for JNOV, Kia challenged the jury's negligence finding, claiming the undisputed evidence established Kia complied with all Federal Motor Vehicle Safety Standards and "this creates a presumption of no negligence." According to Kia, because "there is no evidence to rebut this presumption ... Kia cannot be liable for negligence."

The statute under which Kia claims the presumption arises states in pertinent part:

In a products liability action brought against a product manufacturer or seller, there is a rebuttable presumption that the product manufacturer or seller is not liable for any injury to a claimant caused by some aspect of the formulation, labeling, or design of a product if **the product manufacturer or seller established that the product's formula, labeling, or design complied with mandatory safety standards** or regulations adopted and promulgated by the federal government, or an agency of the federal government, that were applicable to the product at the time of manufacture and **that governed the product risk that allegedly caused the harm.**

TEX. CIV. PRAC. & REM.CODE ANN. § 82.008(a) (West 2005) (emphasis added). The government standard at issue here is Federal Motor Vehicle Safety Standard ("FMVSS") 208. The parties agree that section 82.008 applies only if FMVSS 208 "governed the product risk that allegedly caused the harm." *Id.* The point of contention arises in the construction of this phrase. Kia maintains that compliance with FMVSS 208 triggers the section 82.008 presumption because the standard covers the risk of occupant injury in a crash. In other words, the federal standard is one of crashworthiness, and the product risk is broadly defined to include all injuries resulting from noncrashworthy vehicles. Kia asserts that a restrictive application of the standard governing the product risk would render the governmental-standards defense wholly ineffective. According to Kia, under a narrowly defined standard, a plaintiff could always avoid the presumption by focusing on minute aspects of a design outside the scope of the regulation. Conversely, Ruiz argues the product risk is more narrowly defined. Ruiz asserts that section 82.008 requires a close relationship between the

design, the safety standard, and the product risk; otherwise, the presumption of "no defect" would apply in every crashworthiness case. Ruiz contends the product risk at issue here is not crashworthiness but rather the failure of a frontal airbag to deploy. Because the federal standard does not require a particular design for airbag circuitry, Ruiz insists the standard is a performance rather than a design standard, and as such, the presumption does not apply.

We begin our inquiry by determining whether FMVSS 208 is a performance or a design standard. FMVSS 208 is promulgated under the National Traffic and Motor Vehicle Safety Act of 1966 (the "Safety Act"). *See* 49 C.F.R. § 571.208 (2010). The Safety Act was enacted to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents, and gave the Department of Transportation the power to enact safety standards regulating many facets of automotive design.[1] 15 U.S.C. § 1381 (1966) (15 U.S.C. §§ 1381 through 1431 recodified as 49 U.S.C. §§ 30101 through 30169 (1994)). To this end, the statutory scheme authorizing promulgation of FMVSS 208 directed the Secretary of Transportation to establish "appropriate Federal motor vehicle safety standards." 15 U.S.C. § 1392(a) (repealed 1994). These standards were further defined as "*minimum standard[s] for* ... motor vehicle equipment *performance.*" 15 U.S.C. §§ 1391(2) (repealed 1994) (emphasis added). The first sentence in the section of the Senate Report concerning the scope of this statute states that the "critical definitions which delimit the scope of the bill are those of 'motor vehicle' and 'motor vehicle safety.'" S.REP. No. 89–1301, (1966), *reprinted in* 1966 U.S.C.C.A.N. 2709, 2713. Initially, "motor vehicle safety" was defined as "the *performance* of vehicles or motor vehicle equipment in such a manner that the public is protected against unreasonable risk of accident occurring as the result of the design or construction of motor vehicles." *Id.* (emphasis added). Additionally, that section of the Senate Report describing the nature of the standards noted:

> *Unlike* the General Services Administrations's procurement standards, which are primarily design specifications, [these standards] are expected to be *performance standards,* specifying the required *minimum safe performance of vehicles but not the manner in which the manufacturer is to achieve* the specified performance ... The Secretary would thus be concerned with the measurable performance of a braking system, *but not its design details.* Such standards will be analogous to a building code which specifies the minimum load-carrying characteristics of the structural members of a building wall, but leaves the builder free to choose his own materials and design. Such safe performance standards are thus not intended or likely to stifle innovation in automotive design.

S.REP. No. 89–1301 (1966), *reprinted in* 1966 U.S.C.C.A.N. 2709, 2713–14 (emphasis added).

Therefore, from inception, it appears that the standards were intended as minimum standards applicable to performance

---

**1.** Authority to issue safety standards was originally conferred on the Secretary of Commerce. National Traffic and Motor Vehicle Safety Act of 1966, Pub. L. No. 89–563, §§ 102, 103, 80 Stat. 718, 719. Congress subsequently transferred all power under the Act to the Secretary of Transportation. *See* *Usery v. Tamiami Trail Tours, Inc.*, 531 F.2d 224, 232 (5th Cir.1976) (citing 49 U.S.C. § 1655). The Secretary of Transportation has delegated this authority to the Administrator of National Highway Traffic Safety Administration ("NHTSA"). 49 C.F.R. § 1.50(a) (2008).

characteristics of a vehicle and equipment installed in the vehicle, not to what equipment must, or could be, installed. *See e.g., Perry v. Mercedes Benz of N. Am., Inc.,* 957 F.2d 1257, 1265 (5th Cir.1992) ("Once the manufacturer chooses an option that includes an air bag system, Standard 208 S5–S6 merely set forth *minimum* performance requirements for that system.") (emphasis in original); *Wood v. Gen. Motors Corp.,* 865 F.2d 395, 402 n. 9 (1st Cir.1987) ("the Safety Act authorizes the promulgation of performance standards, rather than design standards . . . ."); *see also Geier v. Am. Honda Motor Co., Inc.,* 529 U.S. 861, 878, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000) (observing that FMVSS 208 sets a "performance requirement for passive restraint devices and allow[s] manufacturers to choose among different passive restraint mechanisms. . . ."). As the United States Supreme Court recently observed, in promulgating FMVSS 208, manufacturer choice was a significant regulatory objective. *See Williamson v. Mazda Motor of Am., Inc.,* — U.S. —, —, 131 S.Ct. 1131, 1136, 179 L.Ed.2d 75 (2011).

The individual provisions of Standard 208 are also framed as performance requirements, not equipment or design requirements. For example, S1 and S2, under

Standard 208, set out the scope and purpose of Standard 208, stating:

S1. **Scope.** [Standard 208] specifies performance requirements for the protection of vehicle occupants in crashes.

S2. **Purpose.** The purpose of [Standard 208] is to [reduce death and injuries to vehicle occupants] by specifying vehicle crashworthiness requirements in terms of forces and accelerations measured, on anthropomorphic dummies in test crashes, and by specifying equipment require-

ments for active and passive restraint systems.

49 C.F.R. 571.208 (2010). Thus, the plain language of Standard 208 reflects that it does not concern the design of equipment to be installed but, rather, performance of the equipment that is installed.

Having concluded that FMVSS 208 concerns performance rather than design, we next consider the standard in the context of section 82.008. Although the statute itself provides no guidance as to the scope of the phrase "govern the product risk that allegedly caused the harm," the legislative history of the statute offers some insight into the Legislature's intent. In both the Senate and the House of Representatives, the following questions and answers "to establish legislative intent" were ordered reduced to writing:

**Question:** I would like to clarify a couple of points relating to the rebuttable presumption created by section 82.008 of the bill. How does the presumption work in a case where the manufacturer complied with all federal standards that exist for a product but no standard exists that relates specifically to the defect that has been alleged by a plaintiff?

**Answer:** The presumption created by the bill would not apply in that case. The bill provides that the presumption comes into play only where there is a mandatory federal standard that governed the product risk that allegedly caused harm. The intent of this language is to have the presumption apply only when there is a **mandatory federal standard that is designed to regulate the aspect of the manufacture or design of the product that the plaintiff claims is defective.** The intent of the bill is to ensure that there is a relationship between the federal standard in question and the defect being alleged by

the plaintiff. If there is not a relationship, the presumption will not apply. *See* H.J. of Texas, 78th Leg., R.S. 6037–38; S.J. of Texas, 78th Leg., R.S. 5005–06 (emphasis added). Thus, it appears the Legislature intended that section 82.008 apply only where there is a specific relationship between the regulation and the alleged defect in the manufacture or design.

Significantly, Kia does not specify which provision(s) of FMVSS 208 it complied with. Instead, Kia globally asserts there is no dispute that the 2002 Spectra complied with FMVSS 208. But compliance with FMVSS 208 in and of itself does not conclude the inquiry. Compliance only operates to trigger the presumption if the design complied with the regulation and the regulation "governed the product risk that allegedly caused the harm." *See* Tex. Civ. Prac. & Rem.Code Ann. § 82.008(a).

The testimony at trial established that Kia complied with FMVSS 208, but it did not establish that FMVSS 208 governed the product risk that allegedly caused the harm.[2] For example, witnesses testified that FMVSS 208 applies to the occupant crash protection system in a vehicle, and includes both seatbelts and airbag systems. One of Ruiz's expert witnesses, Dr. Dennis Shanahan, explained that in order to certify its compliance with federal standards, Kia is required to conduct certain crash tests. A Kia employee testified that the airbag system in the Spectra was tested under FMVSS 208 to ensure that it would deploy in a 30–mile–per–hour frontal crash. All witnesses agreed that the Spectra complied with FMVSS 208, and in the absence of such compliance, could not

have been sold in the United States. Although Kia's expert generally stated that "the design of this restraint system, both the seat belt and the airbag, met all applicable FMVSS," the expert did not identify a specific standard or standards under the FMVSS pertaining to the design of a particular restraint system, and he did not elaborate on how Kia purportedly complied. Despite the uniform agreement that Kia complied with FMVSS 208, however, the witnesses also uniformly agreed that FMVSS does not govern the risk that an airbag will fail to deploy. Indeed, Dr. Shanahan explained that FMVSS has nothing to do with the deployment of an airbag, and stated:

> These are what we call performance standards. They're not design standards. In other words, the government's not telling you how to design the mousetrap. They're telling you how the mousetrap should work, and its up to you as a manufacturer to make it achieve that performance with your own design, allowing creativity on your part.

In support of its argument that FMVSS 208 applies to trigger the section 82.008 presumption because the product risk is "the risk of occupant injury in a crash," Kia relies on *Wright v. Ford Motor Co.*, 508 F.3d 263, 272 (5th Cir.2007). The Fifth Circuit's decision in *Wright*, however, is distinguishable from the instant case.[3]

*Wright* was a design defect case brought by the parents of a child who was killed when a Ford Expedition backed over him in a parking lot. The Wrights claimed the Expedition was defectively designed because of a "blind spot immediately behind

---

2. Under section 82.008, Kia had the burden to "establish" that the design complied with the federal regulation and the regulation "governed the product risk that allegedly caused the harm." *See* Tex. Civ. Prac. & Rem. Code Ann. § 82.008.

3. In addition, the decision is persuasive rather than binding authority. *See Roehrs v. FSI Holdings, Inc.*, 246 S.W.3d 796, 803 (Tex. App.-Dallas 2008, pet. denied).

the vehicle." *Id.* at 267–68. Relying on federal standard FMVSS 111, the trial court instructed the jury under section 82.008 to presume the Expedition was not defectively designed. On appeal, the Wrights asserted the jury instruction was in error because, *inter alia,* FMVSS 111 does not govern the rear sensing system with which they argued the Expedition should have been equipped. *Id.* at 269. The court rejected this argument and held the 82.008 presumption was applicable. In so holding, the court concluded that the risk that caused the harm was precisely what is covered by FMVSS 111. In this regard, the court observed that the stated purpose of FMVSS 111 is to reduce the number of injuries and deaths "that occur when the driver of a motor vehicle does not have a clear and reasonably unobstructed view to the rear." *Id.* The court was further persuaded that the federal standard governed the risk that caused the harm after considering proposed amendments to the standard that would have required rear sensing systems on passenger vehicles. Although the proposed amendments were rejected because the agency concluded such systems were not sufficiently reliable to detect pedestrians, the court noted that the proposed amendments addressed the same risk of which the Wrights complained "in a similar manner as they suggest[ed]." *Id.* at 271–72.

In contrast, the stated purpose of the FMVSS at issue here is to specify "crashworthiness requirements in terms of forces and accelerations" and "equipment requirements for active and passive restraint systems." *See* 49 C.F.R. 571.208. There is no allegation that the injury results from Kia failing the forces and acceleration tests or because it did not equip the Spectra with one of the regulatory options for passive restraint systems. Instead, the alleged injury results from the failure of the drivers-side frontal airbag to deploy because of defectively designed circuitry— an aspect of design that is outside the scope of FMVSS 208's minimum standards of performance. Therefore, unlike *Wright,* the federal standard at issue here does not govern the risk that allegedly caused the harm.

Viewing the statute as a whole, in light of the legislative history, we cannot conclude the Legislature intended to sweep with as broad a brush as Kia suggests. *See* TEX. GOV'T CODE ANN. § 311.023 (West 2005) (describing sources of statutory construction); *see also Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson,* 209 S.W.3d 644, 652 (Tex.2006) (stating when statutory language is nebulous courts may "cautiously consult legislative history to help divine legislative intent"). Consideration of the consequences of an overly broad construction further informs our decision. Construing section 82.008 to encompass the minimum performance standards of FMVSS 208 without regard to any specific defect would afford a seller or manufacturer a no-defect presumption in every case involving the crashworthiness of a vehicle. The Legislature could not have intended such a result. *See Helena Chem. Co. v. Wilkins,* 47 S.W.3d 486, 493 (Tex.2001) (courts presume legislature intended a just and reasonable result); *Villarreal v. San Antonio Truck & Equip.,* 994 S.W.2d 628, 632 (Tex.1999) (statute should not be construed in a way that leads to absurd conclusions when there is a more reasonable interpretation). Accordingly, on these facts, we conclude Kia was not entitled to a no-defect presumption under section 82.008. FMVSS 208 is not a design standard, and it does not govern the risk that allegedly caused the harm in this case. Kia's first issue is overruled.

## II. *Negligent Design*

In its second issue (with multiple subparts), Kia asserts there is no evidence to

support the jury's finding of negligence. In particular, Kia claims there is no evidence of a specific defect, a safer alternative design, breach of the standard of care, or proximate cause.

A "no evidence" issue challenges the legal sufficiency of the evidence. *See BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 795 (Tex.2002). We will sustain a challenge to legal sufficiency if there is a complete absence of evidence of an essential fact, the trial court was barred by rules of law or evidence from giving weight to the only evidence proving an essential fact, no more than a scintilla of evidence was offered to prove an essential fact, or the evidence conclusively establishes the opposite of the essential fact. *City of Keller v. Wilson,* 168 S.W.3d 802, 810 (Tex.2005); *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 334 (Tex. 1998). In determining whether there is legally sufficient evidence to support the finding under review, we view the evidence in the light most favorable to the trial court's determination, crediting favorable evidence if a reasonable fact finder could have done so and disregarding contrary evidence unless a reasonable fact finder could not. *City of Keller,* 168 S.W.3d at 807; *See Also Cent. Ready Mix Concrete Co. v. Islas,* 228 S.W.3d 649, 651 (Tex. 2007). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex.1996); *Leitch v. Hornsby,* 935 S.W.2d 114, 118 (Tex. 1996). "More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact." *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.,* 77 S.W.3d 253, 262 (Tex. 2002).

■ To recover for a products liability claim alleging a design defect, a plaintiff must prove by a preponderance of the evidence that: (1) there was a safer alternative design; and (2) the defect was a producing cause of the personal injury, property damage or death for which the plaintiff seeks recovery. Tex. Civ. Prac. & Rem.Code Ann. § 82.005(a) (West 2011). A "producing cause" is "a substantial factor in bringing about an injury, without which the injury would not have occurred." *Ford Motor Co. v. Ledesma,* 242 S.W.3d 32, 46 (Tex.2007). Generally, competent expert testimony and objective proof that a defect caused the harm is required. *See Nissan Motor Co. Ltd. v. Armstrong,* 145 S.W.3d 131, 137 (Tex.2004).

■ Normally, strict products liability and negligence are separate causes of action with different elements. *See Ford Motor Co. v. Miles,* 141 S.W.3d 309, 315 (Tex.App.-Dallas 2004, pet. denied). Here, however, because the only negligence Ruiz alleged related to the design of the product, the negligence theories were subsumed and encompassed in the defective product theory, and Ruiz's burden at trial was to prove injury resulting from defective design. *See Shaun T. Mian Corp. v. Hewlett–Packard Co.,* 237 S.W.3d 851, 857 (Tex.App.-Dallas 2007, pet. denied).

The jury charge asked the jury to determine whether Kia's negligence in designing the Spectra proximately caused injury to Andrea Ruiz, and defined "negligence," "ordinary care," "design defect," and "safer alternative design." Neither party assigns error to the manner in which the case was submitted to the jury. Therefore, we review the sufficiency of the evidence in light of the charge that was actually given. *See Romero v. KPH Consol. Inc.,* 166 S.W.3d 212, 220–21 (Tex.2005) (stating charge reviewed as given even if statement of law in charge incorrect); *Wal–Mart Stores, Inc. v. Sturges,* 52 S.W.3d 711, 715 (Tex.2001).

## A. Evidence Of Defect.

■ Ruiz's theory was that defective wiring harness connectors created an open circuit in the driver's airbag circuit. Ruiz's airbag expert, Geoffrey Mahon, explained that the circuitry in the Spectra's airbag system includes a small computer called an airbag diagnostic unit ("ADU") which is mounted on the floor of the vehicle behind an instrument panel. The ADU determines whether a crash warrants sending an electrical signal to the airbag module (the package mounted in the steering wheel containing the inflator and the folded airbag) to command the frontal airbags to deploy. A wiring harness exits the side of the ADU via a connector that plugs in with a lever that locks it securely in place. The wiring harness snakes through the dashboard, making an electrical circuit between the ADU and four safety devices; the driver's frontal airbag, the passenger's frontal airbag, the driver's seatbelt pretensioner, and the passenger's seatbelt pretensioner. Because the wiring harness from the ADU to the driver's airbag must be routed through the steering column, the wiring first connects via a small plastic connector to a device known as a "clock spring" mounted inside the steering column.[4] The wiring then exits the clock spring via another small plastic connector to the back of the airbag module in the steering wheel.

Kia and TRW, the ADU manufacturer, downloaded data from the ADU to determine why the driver's frontal airbag did not deploy. The download showed that the ADU sensed the collision and signaled to deploy both the frontal airbags and the two seatbelt pretensors. The passenger's frontal airbag and the two pretensors did deploy; the driver's side airbag did not. Kia confirmed that, as a matter of design, the passenger's frontal airbag should never deploy without the driver's frontal airbag also deploying. The download also reflected an error code "56," which indicates an open electrical circuit in the driver's side airbag. The data showed this open circuit existed continuously before the accident for almost forty-four hours on the car's lifetimer.[5]

Both sides inspected the airbag circuitry, jointly removed the components, and subjected them to exhaustive testing and analysis. There is no dispute that the failure of the driver's airbag to deploy resulted from an open circuit. Further, all agreed that the open circuit in the driver's airbag system did not occur in the clockspring itself, the ADU, the airbag module, or the wiring harness wires.

Mahon testified that at the time of the collision, the ADU commanded the airbag to deploy, but the airbag failed to do so because of the open circuit. Mahon concluded to a reasonable engineering probability that the open circuit was caused by a design defect in the driver's airbag wiring harness circuit, and the defect rendered the design unreasonably dangerous. Mahon narrowed the source of the open circuit down to two connectors; the connector to the clockspring and the connector at the back of the airbag module. With the connector from the ADU to the wiring harness removed, Mahon and a Kia representative witnessed an intermittent open circuit. Mahon explained that an intermittent fault is more difficult to pinpoint than a continuous fault, but because an electri-

---

4. The clock spring is a spring-loaded device that allows the wiring inside it to spool and unspool as the steering wheel is turned so that the wiring to the airbag does not become tangled, crimped, or broken.

5. The lifetimer measures how long the car's ignition is in the "on" position,

cal circuit requires metal-to-metal contact, and because the other sources had been eliminated, the open circuit had to have occurred at the only remaining places where two pieces of metal come together. Thus, the only remaining possibilities were the connector to the clockspring and the connector to the back of the airbag, because "it physically can't occur anyplace else." Mahon opined that the connectors to the back of the airbag module and to the clockspring were defectively designed because they failed to make reliable electrical contact, causing an open circuit in the driver's airbag system, and the design problems with the faulty connectors existed at the time the vehicle left Kia's control.

■ Kia maintains there is no evidence to support the negligence finding because Mahon was unable to specify which of the two connectors was defective and did not identify the defect within the connectors. In support of its argument, Kia correctly states the general proposition that in a products liability case, "a specific defect must be identified by competent evidence." *Nissan*, 145 S.W.3d at 137; *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600–01 (Tex.2004). But we do not read Kia's supporting authority or any other authority to mandate the degree of engineering or scientific specificity Kia suggests.

In *Ford*, plaintiffs brought a negligence and products liability suit against the automobile manufacturer when their truck caught on fire. In an attempt to defeat the manufacturer's subsequent motion for summary judgment, the plaintiffs submitted an expert affidavit in which the expert stated that he had visually inspected the

truck and "suspected" the electrical system caused the fire. Noting that the expert could not rule out the fuel system as a possible cause and the absence of proof to establish a defect in the truck at the time it left the manufacturer, the court concluded the expert's affidavit was insufficient to raise a fact issue on summary judgment. *Ford*, 135 S.W.3d at 601. Likewise, in *Nissan*, an unintended acceleration case, the court concluded that the "mere occurrence of an unintended acceleration incident is no evidence that a vehicle is defective." *Nissan*, 145 S.W.3d at 137. Rather, "a specific defect must be identified by competent evidence and other causes ruled out."

This case, however, does not involve the lack of specificity or speculation present in *Nissan* and *Ford*. After extensive testing, Mahon did identify a specific defect—the driver's airbag wiring harness circuit that was equipped with connectors that fail to make reliable electrical contact. Mahon further specified that one or both of two components of the circuit caused it to remain open. Mahon and others testified in great detail about the process of testing to eliminate other causes.[6]

In addition, when comparing the Kia connectors to designs by Packard and Volkswagen, Mahon identified several difficulties with the Kia connectors. With regard to the connector at the back of the module, Mahon opined that the Packard design is more likely to hold the connector into the back of the airbag. Although both the Kia and Packard module connectors have locking tabs that push the plastic tabs on the connectors outward to prevent them from moving or becoming disconnected,

**6.** Kia complains that Mahon failed to test the ADU connector, and therefore did not eliminate it as a potential cause. But Kia cites no authority for the proposition that a plaintiff must test and eliminate every conceivable cause. Moreover, the ADU connector was

eliminated as a potential cause because it performed as expected and because the intermittent open circuit that Mahon and the Kia representative observed during testing occurred while testing the part of the circuit that did not include the ADU.

Kia's connector only locks into one side, while the Packard connector pushes the whole tab out to prevent loss of contact. Kia also uses thin plastic in the connector, which allows "play," causing "poor contact" and a loss of electrical connectivity.

Mahon also testified that Kia's clockspring connector connects directly to the clockspring, and is subject to more vibration, while the Packard connector is more robust, and is anchored away from the vibration in the steering column. The Packard connector has a large metal surface area, providing good "metal-to-metal" contact for purposes of connectivity. Kia's connector has a single spring-loaded tab, whereas the Packard connector has an additional locking mechanism.

Considering Mahon's testimony in the context of our no-evidence review, we conclude the evidence furnishes "a reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact," and therefore constitutes more than a scintilla of evidence to support the jury's finding. See Rocor, 77 S.W.3d at 262.

Kia also argues there is no evidence of a safer alternative design because Ruiz failed to "prove a specific design defect." Because we have concluded the design defect evidence was legally sufficient, we need not address this aspect of Kia's challenge. See Tex.R.App. P. 47.1.

Kia's argument that there is no evidence of causation because there is no evidence of design defect similarly fails. In the alternative, Kia asserts Mahon's testimony did not prove causation "because his claimed defect is not what happened." Kia claims because it is "undisputed" that the open circuit was continuous, Mahon's testimony about an intermittent open circuit cannot establish causation. The record, however, does not support Kia's contention. Kia's representative confirmed that there was an intermittent open circuit.

And the record reflects that circuit was open before the collision, closed again in the crash, and then briefly opened again during testing. Thus, Mahon's testimony is not inconsistent with "undisputed" facts. Kia's arguments concerning the lack of causation are overruled.

**B. Breach of Industry Standard Of Care.**

■ Next, we consider Kia's argument that there is no evidence that Kia breached the industry standard of care. Mahon testified there is an expected fifteen-year life of a vehicle. Both Mahon and Kia's expert, Robert Gratzinger, agreed that the industry standard for a "safety critical device" such as airbags is to limit failures to one in a million occurrences. This standard, QS–9000, is referred to as "six nines," which represents 99.9999 reliability.

Christopher Caruso, Ruiz's engineering expert, and Mahon both testified about an automotive industry process known as Failure Mode and Effects Analysis ("FMEA") in which a manufacturer repeatedly tests and refines its designs to improve and ensure reliability. During the FMEA process, engineers run tests to identify risks and do whatever is necessary to fix them. Caruso, a former GM and Delco employee, testified that when engaged in the FMEA process with his former employers, "just about everything in the airbag system that resulted in the potential failure to deploy the airbag was ranked as a 10 ... mean[ing] severe problem, got to fix it." Caruso further stated "You have to make this system fail safe in this area." Caruso had never heard of any issues with a Packard connector system or harness system with GM vehicles, but if there had been such a problem, he would expect an investigation. Caruso testified that in his twenty-seven years with GM

and Delco, he had never seen a manufacturer fail to review FMEA documents, design drawings, and quality standards before putting a vehicle into production. The first page of QS–9000 was admitted into evidence with no objection. Caruso testified that the standard applies to manufacturers, suppliers, and "everybody in the chain."

Kia's corporate representative, Michelle Cameron, testified that before the date of the accident, Kia had received, verified, and paid for sixty-three warranty claims involving open circuits in the driver's airbag system for the 190,073 similar Spectras sold in the United States. The average time between the date each Spectra was manufactured and the date of each warranty repair was 14.7 months. Cameron acknowledged that the sixty-three open circuits in 190,073 vehicles—without adjusting for the fifteen-year airbag system life—amounted to 331.4 failures per million.

In addition, Mahon testified that, at a minimum, Kia should have FMEA documentation from its suppliers. But Kia's airbag expert testified he had not seen any FMEA documentation or quality control standards for Kia's wiring harnesses before trial. Kia's employee, Sueng–Woo Lee testified that Kia did not do a FMEA on the airbag system to rule out a situation where there could be a short causing one airbag to deploy and one not to deploy because they "never had an experience of anything like this occurring." Viewing the evidence under the appropriate standard, we conclude the evidence was legally suffi-

cient to establish breach of the standard of care.[7]

## C. New Defect Theory.

 Toward the conclusion of trial, Kia recalled Ruiz to the stand to demonstrate how he could have inadvertently disconnected the wiring harness connector to the clockspring when he installed the new radio. During closing argument, Ruiz argued Kia's demonstration showed how dangerous the connector was if it could come off so easily. In the remaining subpoints of its second issue, Kia now asserts this was a "new defect theory," for which there was no evidence of design defect, breach of the standard of care, or causation. But Kia did not object to Ruiz's argument or otherwise bring the allegedly improper "new defect theory" to the trial court's attention. Thus, this portion of Kia's issue has not been preserved for our review.[8] See TEX.R.APP. P. 33.1. Kia's second issue is overruled.

## III. Admission and Exclusion of Evidence

In its third and fourth issues, Kia argues the trial court abused its discretion in admitting and excluding certain evidence. The evidence Kia contends was improperly admitted includes a warranty-claims spreadsheet, an untimely disclosed legal theory, and two wiring harnesses Kia claims were not timely disclosed. The excluded evidence about which Kia complains includes rebuttal evidence concerning quality control procedures, and video and photographs of a NHTSA crash test. Kia also

---

**7.** The jury charge instructed that "ordinary care," when used with respect to Kia's conduct, means "that degree of care that would be used by a corporation of ordinary prudence under the circumstances."

**8.** In addition, we note that reasonable inferences and deductions from the facts are per-

missible in final argument. See Anderson v. Vinson Expl., Inc., 832 S.W.2d 657, 666 (Tex. App.-El Paso 1992, writ denied). We further note that argument is not improper when it is invited or provoked. See Living Ctrs. v. Penalver, 256 S.W.3d 678, 680 (Tex.2008).

maintains the trial court abused its discretion in refusing its request for a jury view of Ruiz's car.

 Whether to include or exclude evidence is a matter committed to the trial court's sound discretion. *Interstate Northborough P'ship v. State,* 66 S.W.3d 213, 220 (Tex.2001); *Tex. Dep't of Transp. v. Able,* 35 S.W.3d 608, 617 (Tex.2000). "Erroneous admission of evidence requires reversal only if the error probably though not necessarily resulted in [the rendition of] an improper judgment." *Nissan,* 145 S.W.3d at 144; *see also Interstate,* 66 S.W.3d at 220. To make this determination, we review the entire record. *Nissan,* 145 S.W.3d at 144; *Able,* 35 S.W.3d at 617; *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753–54 (Tex.1995).

## A. Untimely Disclosed Legal Theory.

 We begin with the evidence Kia asserts was erroneously admitted. First, Kia contends the trial court erred in allowing Ruiz to argue an untimely disclosed legal theory. According to Kia, it was surprised and prejudiced by the new theory, and unable to mount an effective legal defense.

The "new legal theory," set forth in Ruiz's sixth supplemental disclosure, asserts Kia failed to have adequate quality control procedures. The supplemental disclosure was made thirty-one days before trial. Kia contends the negligence count in Ruiz's petition did not include this claim, and the untimely disclosure was an attempt to circumvent the pleading deadline. We disagree.

 In his original petition, Ruiz alleged that Kia negligently designed the Spectra "with design standards that were

intended to meet the minimum government regulations, instead of safely designing the vehicle." In the supplemental disclosures at issue, Ruiz stated:

> Defendants ... breached their duty of care by:
>
> a. designing or distributing the vehicle with design standards that were intended to meet the minimum government regulations, instead of safely designing the vehicle to reasonably minimize injuries ... deaths and foreseeable frontal collisions;
>
> b. failing to adequately monitor the performance of similar and prior vehicle models in the field to ensure that they were reasonably minimizing injuries and deaths in foreseeable frontal collisions;
>
> c. **failing to have adequate quality control procedures;** and
>
> d. failing to adequately test the vehicle to ensure that it would be reasonably safe in foreseeable frontal collisions.

(Emphasis added). Viewing Ruiz's pleading in conjunction with the amended disclosure, we decline to adopt Kia's characterization of the quality control assertion as a "new legal theory." [9] Typically, the exclusion of a new legal theory involves a party attempting to assert a different cause of action. *See, e.g., Hakemy Bros. Ltd. v. State Bank & Trust Co.,* 189 S.W.3d 920, 925 (Tex.App.-Dallas 2006, pet. denied) (disallowing amended pleading with entirely new cause of action); *NCS Mgmt. Corp. v. Sterling Collision Ctrs., Inc.,* 108 S.W.3d 534, 537 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (denying pleading amendment adding fraud and breach of fiduciary duty to simple breach of contract case). Here, the reference to Kia's failure to follow quality control pro-

---

9. To the extent the nature of Ruiz's negligence claim as plead was unclear, Kia was obligated to file special exceptions to Ruiz's pleadings. *See* Tex.R. Civ. P. 91. Kia's failure to do so forecloses complaint about a lack of clarity on appeal. *See* Tex.R. Civ. P. 90.

cedures simply expounded upon how Kia deviated from the standard of care. Breach of the standard of care is an element of negligence Ruiz was required to prove, and the supplemental information pertained to this element.[10] *See generally, Cobb v. Dallas Fort Worth Med. Ctr.– Grand Prairie,* 48 S.W.3d 820, 825 (Tex. App.-Waco 2001, no pet.) (stating standard of care is threshold issue in negligence case); *see also generally, FFE Transp. Servs. Inc. v. Fulgham,* 154 S.W.3d 84, 90–91 (Tex.2004) (expert testimony necessary to establish standard of care when negligence of such a nature as not to be within layman's experience). Therefore, the supplemental information did not inject a new cause of action into the case. *See e.g., Zavala v. Trujillo,* 883 S.W.2d 242, 246 (Tex.App.-El Paso, 1994, writ denied) (concluding trial amendment adding negligence per se to negligence claim did not inject a new cause of action).

Although Kia globally asserts this "unanticipated legal theory" resulted in surprise and prejudice, Kia provides no specifics as to how this purportedly occurred. The record reflects that Kia's performance of quality control measures was discussed at the deposition of Kia's corporate representative two years before trial. During the same general time frame, Ruiz requested quality control documents in a deposition duces tecum. Mahon's expert report was critical of Kia's failure to comply with quality control standards, and he testified more extensively about the matter in his deposition. Caruso also testified about quality control and industry standards in his deposition. Therefore, even if we were to assume the supplemental disclosure was an untimely disclosed new legal theory, the record does not support Kia's claim that it suffered surprise and prejudice. Kia's complaint about an untimely disclosed legal theory is overruled.

**B. Untimely Disclosed Evidence.**

█ Kia also challenges the trial court's determination concerning the admissibility of physical evidence it claims was untimely produced. Over Kia's objection, the trial court admitted into evidence a wiring harness from a 2002 Volkswagen Golf and a wiring harness manufactured by Packard for a 2002 Cadillac. The wiring harnesses were used by Mahon to demonstrate his testimony about safer alternative designs. Kia claims the wiring harnesses were not timely produced, and therefore were subject to exclusion under TEX.R. CIV. P. 193.6(a). The record, however, does not support Kia's contention.

█ The general rule in Texas is that a party must make a full and complete response to proper discovery requests and this obligation includes the duty to timely supplement discovery at least thirty days before trial. *Branham v. Brown,* 925 S.W.2d 365, 370 (Tex.App.-Houston [1st Dist.] 1996, no writ) (discussing former rule 166b(6)). An amended or supplemental response must be made "reasonably promptly" after a party discovers the necessity for such a response. *See* TEX.R. CIV. P. 193.5(b).

█ The rules further provide that "[a] party who fails to make, amend, or supplement a discovery request in a timely manner may not introduce in evidence the material or information that was not timely disclosed. ...." TEX.R. CIV. P. 193.6(a). The rule is mandatory, and the penalty—exclusion of evidence—is automatic, absent a showing of (1) good cause; (2) lack of

---

**10.** Kia acknowledges that proof of the standard of care was required. In another section of its brief, Kia states "[b]ecause [Ruiz] submitted [his] claim as a negligence theory ... he had to prove that Kia fell below the industry standard of care."

unfair surprise; or (3) lack of prejudice. *See* TEX.R. CIV. P. 193.6(a)(1), (2); *see also* *Good v. Baker*, 339 S.W.3d 260, 271 (Tex. App.-Texarkana 2011, no pet.). But on this record, there is no showing that the wiring harnesses were not timely disclosed. Although Kia contends the disclosure was untimely, it does not specifically identify the deadline the disclosure is alleged to have violated. Instead, Kia asserts Mahon did not disclose his opinion about the wiring harness during his deposition, and asserted a similar objection at trial. Although the record does contain an amended agreed scheduling order, it is unsigned and thus does not advance our inquiry. The record does demonstrate, however, that the parties extended discovery deadlines, particularly those pertaining to experts, several times by agreement. Indeed, expert discovery was ongoing only a month before trial, and fact discovery appears to have been extended to less than a month before trial. The record further reflects that Mahon's expert report expressly mentioned the 2002 Golf wiring harness, and the Golf and Packard wiring harnesses were generally discussed at his deposition. In Ruiz's sixth supplemental disclosure, made thirty-one days before trial, Ruiz stated, "Mahon reserves the right to use all the material and information referenced in his report at trial." The supplement further stated "[t]he entire file of Mr. Mahon, as well as exemplar components, such as airbags, modules, inflators, RCM's, sensors, connectors, wiring, industry standards and practices, and FMVSS regulations and dockets will be made available for inspection at a mutually convenient time...." Although the duty to supplement applies to expert witnesses, our rules do not prevent experts from reforming calculations and perfecting reports through the time of trial. *See Exxon Corp. v. W. Tex. Gathering Co.*, 868 S.W.2d 299, 304–05 (Tex.1993). Because the record does not demonstrate that these disclosures were untimely or otherwise not reasonably prompt, the automatic exclusion under rule 193.6(a) does not apply, and the trial court did not abuse its discretion in admitting the wiring harnesses into evidence.[11]

## C. Warranty Claims.

 In discovery, Ruiz requested warranty claim information concerning the airbag system in 2002 Spectras and similar vehicles. In response, Kia created and produced a spreadsheet summarizing warranty claims for a short or open circuit in the front airbag system. The spreadsheet listed 432 warranty claims, sixty-seven of which involved error code "56." At trial, the spreadsheet was admitted into evidence over Kia's objection.

Kia argues the spreadsheet was improperly admitted into evidence because it is hearsay, and the business records, voluminous records summary, adoptive admission, and other hearsay exceptions do not apply. According to Kia, the spreadsheet contains multiple layers of hearsay, including statements made by customers and technicians. Kia further asserts the spreadsheet is not relevant because only sixty-seven claims involve error code 56, and the claims are not sufficiently similar under *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 138 (Tex.2004). Ruiz responds that Kia partially waived any error resulting from the admission of the spreadsheet because Cameron testified without objection about the sixty-seven code 56 claims reflected in the document.

11. In addition, we note that the same evidence was substantially presented through Mahon's testimony without objection.

Ruiz further asserts that the spreadsheet was not inadmissible hearsay, or in the alternative, admitting the document into evidence was not harmful.

Tex.R. Evid. 105(a) provides:

When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly; but, in the absence of such request, the court's action in admitting such evidence without limitation shall not be a ground for complain on appeal.

*Id.* Kia did not request a limiting instruction. Thus, if the spreadsheet was admissible for any purpose, the trial court did not err in admitting it into evidence. *See Horizon/CMS Healthcare Corp. v. Auld,* 34 S.W.3d 887, 906 (Tex.2000).

■ Rule 801(e)(2) provides that admissions of a party-opponent are admissible non-hearsay. Tex.R. Evid. 801(e)(2); *Reid Road Mun. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.,* 337 S.W.3d 846, 855 (Tex.2011). Admissions by a party-opponent include:

(A) the party's own statement in either an individual or representative capacity;

(B) a statement of which the party has manifested an adoption or belief in its truth;

(C) a statement by a person authorized by a party to make a statement concerning the subject;

(D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment made during the existence of the relationship; or

(E) a statement made by a co-conspirator of a party during the course and in furtherance of the conspiracy.

Tex.R. Evid. 801(e)(2). "An admission by a party-opponent, being merely a piece of evidence, is not conclusive against the party opponent; it is simply admissible and the party may offer evidence in contradiction or explanation of it." *See Cleveland Reg'l Med. Ctr. v. Celtic Properties, L.C.,* 323 S.W.3d 322, 338 (Tex.App.-Beaumont 2010, pet. filed).

The spreadsheet at issue here was created by Kia and produced in discovery. Cameron testified that the sixty-seven open circuits reflected on the spreadsheet were all claims submitted to Kia and paid. The claims were paid because the technicians confirmed the claims all involved defects. Before accepting the claims, Kia would rule out any modification inconsistent with the warranty. After payment, Kia would submit the claims to other entities for reimbursement. When a party-opponent has manifested an adoption of belief in a statement's truth, it is admissible under rule 801(e)(2)(B). *See Reid Road,* 337 S.W.3d at 856. Moreover, as the Texas Supreme Court has observed, "[i]t has long been the rule that "[w]here a party has used a document made by a third party in such a way as amounts to an approval of its contents, such statement may be received against him as an admission by adoption." *Id.* Thus, we conclude the portion of the spreadsheet reflecting the sixty-seven code 56 claims was admissible as an admission by a party-opponent under Tex.R. Evid. 801. Because Kia did not request a limiting instruction as to the statements from customers listed on the spreadsheet or the remainder of the warranty claims, the inclusion of these items is not ground for complaint on appeal. *See* Tex.R. Evid. 105(a).

■ Finally, even if admitting the spreadsheet was erroneous, it cannot be said that admitting it into evidence probably caused the rendition of an improper

judgment. The spreadsheet was cumulative of other evidence presented. *See Nissan,* 145 S.W.3d at 144. Cameron testified in detail about the warranty claims and the content of the spreadsheet. Ruiz did not emphasize all of the claims on the spreadsheet; rather, he referred primarily to the sixty-seven code 56 claims pertaining to the front airbag system. The spreadsheet is difficult to decipher because it has numerous symbols and codes that are meaningless absent explanation. And the dissimilar warranty claims here are distinguishable from those in *Nissan.* In *Nissan,* the unverified customer complaints were the only evidence of defect and the plaintiff did not present any expert testimony. Here, Ruiz presented extensive expert testimony about the defect that did not rely on the spreadsheet. In addition, Kia has failed to demonstrate that the verdict turned on the admission of the spreadsheet. *See id.; see also State Office of Risk Mgmt. v. Allen,* 247 S.W.3d 797, 799 (Tex.App.-Dallas 2008, no pet.). Therefore, considering the entire record, we conclude the spreadsheet probably did not cause the rendition of an improper judgement. *See Horizon,* 34 S.W.3d at 907. Kia's complaint about the admission of the spreadsheet is overruled.

## D. Kia's Quality Control Procedures.

■ The day before trial, Kia produced approximately twenty-five pages of documents concerning quality control standards. The documents, which were written in Korean, arrived from Korea the day after John Hinger participated in a video conference with Kia's wiring harness supplier. When Kia indicated that it intended to offer the documents into evidence, Ruiz objected that they had not been timely produced, and the trial court ultimately sustained the objection. Kia then made a bill of exception to show that both Kia and Eura, the wiring harness supplier, had cer-

tificates showing that they have proper quality control procedures in place. The trial court refused to allow the evidence.

Kia now contends the evidence was erroneously excluded. In support of its argument, Kia maintains: (1) the evidence was not untimely because it had no obligation to produce the documents in light of valid objections asserted in discovery; (2) at the time the documents were requested, they were not relevant to Ruiz's design claim; and (3) Kia had no obligation to produce documents from its suppliers because the documents were not in Kia's possession, custody, or control. In the alternative, Kia asserts there was good cause for the untimely production because Ruiz injected the quality control theory into the case only a month before trial. All of these arguments lack merit.

First, as set forth previously, quality control was not a novel issue injected into the case on the eve of trial. Rather, in this negligence case involving an alleged breach of the industry standard of care, it was an element of the claim to be reasonably anticipated. Thus, there was no good cause for the untimely production of the documents.

And the documents were untimely. In a notice of deposition duces tecum served two years before trial, Ruiz requested documents concerning quality control standards. Kia objected to the request and moved to quash the deposition. Specifically, Kia objected to the request as "vague, ambiguous, overly broad, harassing, and unduly burdensome *to the extent it seeks information that is not relevant to the issues raised by plaintiff's claims, and is not limited to the vehicle and/or components at issue in this case, is not limited by a reasonable time frame, and seeks information that is neither relevant nor reasonably calculated to lead to the discov-*

*ery of admissible evidence."* (Emphasis added). Although the trial court overruled Kia's motion to quash, Kia claims that absent a court order overruling its objections, it had no obligation to produce the documents. We disagree.

Our record of the scope of the court's ruling on the motion to quash is not entirely clear. The record contains an order overruling the motion to quash, and the order references a hearing on the motion. Although we have a record of what appears to be one of many hearings concerning the scope of discovery, it is impossible to determine whether the court specifically considered Kia's objections to quality control documents requested in the duces tecum, or whether Kia specifically argued these particular documents were not in its possession, custody, or control.

During the pretrial hearing in which the parties argued about the admissibility of the quality control documents, both parties referenced the hearing on the motion to quash. Arguing that the quality control documents should not be admitted into evidence, counsel for Ruiz characterized the earlier hearing as involving Kia's sworn testimony that it could not produce the records because they were privileged. Counsel for Kia denied that it had ever asserted the documents were privileged. Instead, counsel claimed to have argued Kia was not entitled to obtain the documents because they contained confidential and proprietary information that did not belong to Kia. Because we have only isolated, conflicting references to the arguments asserted in connection with the quality control documents, we cannot determine whether Ruiz's assertion that the court's ruling required production of the documents is correct.

The record does reflect, however, that Kia's objections to the duces tecum were qualified and limited. Specifically, Kia objected to production of the quality control documents "to the extent" the quality control documents were not relevant, reasonably limited in time, or pertaining to the vehicle or components at issue. A party is required to comply with written discovery to the extent no objection is made. Tex.R. Civ. P. 193.2(b) & comment 2; *see also In re CI Host, Inc.,* 92 S.W.3d 514, 516 (Tex. 2002). When a party objects to producing documents from a remote time period, it must produce documents from a more recent time period. *See* Tex.R. Civ. P. 193, comment 2. In this negligence case involving allegations that Kia breached the standard of care in the design of the 2002 Spectra airbag system, there is no question that quality control documents were relevant. *See* Tex.R. Evid. 401; Tex.R. Civ. P. 192.3 (party may obtain discovery regarding any matter not privileged and relevant to subject matter); *Ford Motor Co. v. Castillo,* 279 S.W.3d 656, 664 (Tex. 2009) (noting "relevant to the subject matter" is to be liberally construed to allow litigants the fullest knowledge of facts and issues to be tried). The quality control documents Kia produced on the eve of trial showed that Kia and its wiring harness supplier were "ISO 9001" certified.[12] The documents pertained to the wiring harness in the vehicle at issue in the case. Indeed, Hinger opined that the evidence directly related to Ruiz's claim that Kia had negligent quality control. Thus, the documents were outside the scope of Kia's objections concerning relevance and unlimited time, scope, and subject matter and should have been produced at the time the objections were made. *See* Tex.R. Civ. P. 193.2(b).

---

**12.** ISO certification means the company agrees to adhere to certain quality control and record keeping procedures and abide by certain test standards.

Significantly, Kia's written objections to the duces tecum do not assert a lack of possession, custody, or control. Yet Kia now argues that Eura voluntarily produced some of its documents right before trial, and it "stands to reason that another company's documents are not under Kia's possession, custody, or control."[13] We are not persuaded by this argument.

■ A party has "possession, custody, or control" of an item if he has physical possession that is equal or superior to that of the person who has physical possession. *See* TEX.R. CIV. P. 192.7(b); *In re Kuntz*, 124 S.W.3d 179, 181 (Tex.2003); *GTE Comms. Sys. v. Tanner*, 856 S.W.2d 725, 729 (Tex.1993). The right to obtain possession is a legal right based on the relationship between the party responding to discovery and the person or entity that has actual possession. *GTE*, 856 S.W.2d at 729. When Hinger was asked why Kia could not have done this type of discovery two years before the documents were produced, Hinger replied "I didn't have a meeting with the folks from Eura two years ago." Hinger also testified that Kia can audit its suppliers and ask to see quality control "specs." During the hearing on the admissibility of the proffered evidence, Kia insisted it did not withhold the information, but simply did not have it. The trial judge stated, "you didn't have it because you didn't go knock on the door back when they requested it." The record supports the trial court's assessment. Under these circumstances, we conclude the trial court did not abuse its discretion in refusing to admit the untimely produced documents into evidence. Kia's complaint about the exclusion of the quality control documents is overruled.[14]

### E. Crash Test Evidence.

■ With regard to the injury mechanism of the accident, Ruiz argued that a large wound on Andrea Ruiz's forehead showed that her head hit the A-pillar of the vehicle, causing cervical dislocation.[15] Ruiz argued Ms. Ruiz's head would not have hit the A-pillar if the airbag had deployed.

Kia argued that Andrea Ruiz's head did not reach the A-pillar because she was restrained by her seatbelt and shoulder harness, and by the dashboard and steering wheel which were mashed toward her by the invading truck. Kia also argued that a deployed airbag would not have made a difference because: the truck would have hit Ms. Ruiz's head anyway, the accident was so severe it was not survivable on the driver's side, and the steering wheel was shoved inboard so far that Ms. Ruiz would have missed the airbag.

During trial, Kia offered into evidence a NHTSA crash test video in which the airbag missed the crash-test dummy and the dummy's head was struck by the invading vehicle. Kia also offered some still photographs of the crash test. The trial court excluded both the video and the photographs because they were dissimilar from the Ruiz accident. The video was also excluded because it was cumulative and prejudicial. Kia argues the trial court abused its discretion by excluding the video because Ruiz's expert relied on the video and the exclusion impeded its ability

---

13. Based on the references in the record discussed above, we assume the issue was raised during the hearing on the motion to quash or one of the other discovery hearings.

14. Kia's single sentence alternative argument that the trial court abused its discretion in denying its motion for continuance is also overruled. *See* TEX.R.APP. P. 38.1(i).

15. The A-pillar is the roof-support pillar at the junction of the driver's door and the windshield.

to cross-examine the expert. Kia further contends the high probative value of the video was not substantially outweighed by its prejudicial effect. When offering the video at trial, Kia acknowledged that the crash depicted in the video was not substantially similar to the Ruiz accident, but argued the video should be admitted to illustrate "occupant kinematics" and as an instructive teaching tool. According to Kia, because the video was offered to explain the science behind its theory rather than as a recreation of the accident, the similarity need not be as close.

While Kia's correctly observes that substantial similarity is not required when evidence is used to demonstrate general scientific principles, it ignores an important distinction. As the Fifth Circuit has observed:

> When the demonstrative evidence is offered only as an illustration of general scientific principles, not as a reenactment of disputed events, it need not pass the substantial similarity test. Such demonstrative aids, however, must not be misleading in and of themselves, and one such way that a demonstration might mislead is when ... the demonstration resembles the disputed accident.

*Muth v. Ford Motor Co.*, 461 F.3d 557, 566 (5th Cir.2006). In *Muth*, the district court rejected the proffered demonstration as insufficiently similar, but too closely resembling the disputed accident to effectively present abstract principles without misleading the jury. *Id.* The Fifth Circuit upheld the district court's determination, noting that the similarities between the crash test and the accident at issue heightened the prejudicial effect of the evidence, and this prejudicial effect was sufficient to justify the exclusion of the evidence. *Id.* at 567.

This rationale is equally applicable here. Kia's experts opined that the vehicles in the crash test were similar to the vehicles involved in the Ruiz accident, and noted that both the crash test and the Ruiz accident involved offset frontal crashes. But the crash test video depicted a sports utility vehicle crashing into a Honda Accord at a nearly 45 degree angle. In the Ruiz accident, a pick-up truck crashed into the Spectra head-on. One of Kia's expert witnesses, Dennis Schneider, testified that when you have "two cars moving at each other ... you've got to come within one inch really of where you want to hit. Otherwise, you get a different accident." Schneider agreed that a different crash test, which was shown to the jury, "was the most related to the crash that Kia did." Thus, the crash test video was sufficiently similar to the Ruiz accident as to be misleading. Moreover, Kia elicited extensive testimony about the excluded crash test on both direct and cross examination. Thus, the jury heard the evidence; it was simply presented without the potentially misleading and prejudicial visual aids.

We are similarly unpersuaded by Kia's argument that the video was admissible because Shanahan relied on it in forming his opinion. Shanahan reviewed the opinion and file of Kia's expert Dennis Schneider, and concluded that Schneider's defensive theory was incorrect. Because the crash-test video was among the items included in Schneider's file and therefore among the items Shanahan reviewed, Kia argued Shanahan relied on the video in forming his opinion. Despite Kia's argument, however, Shanahan expressly disclaimed such reliance, and stated he did not rely on the video in forming his opinion. Consequently, the video was not admissible as facts or data underlying Shanahan's opinion. *See* Tex.R. Evid. 705(a). Kia's issue concerning the exclusion of the crash test video and photographs is overruled.

## F. Jury View.

 Finally, Kia argues the trial court's denial of its request for a jury view of the car constituted an abuse of discretion. Kia claims because Ruiz introduced the driver's side door into evidence, the jury should have seen the entire car. Kia also claims the jury was unable to "properly contextualize" the evidence about the forces acting during the collision. In making this argument, Kia acknowledges that Texas law does not favor jury views. *See Taylor v. Am. Fabritech, Inc.*, 132 S.W.3d 613, 623 (Tex.App.-Houston [14th Dist.] 2004, pet. denied). Nonetheless, Kia insists that "to the extent Texas law does not support Kia on this issue, Texas law should be changed." We are not persuaded by this argument.

Kia advances no reasoning or authority to support its proposed departure from the norm. During the course of this lengthy trial, the jury saw over 200 photographs of the vehicle from many different angles. Both parties utilized exemplars to demonstrate the driver's side compartment of the vehicle and the component parts at issue, and there is nothing to suggest the jury was unable to contextualize this or any other evidence. The vehicle, which was subjected to testing after the accident, was not in its original condition. Thus, we fail to see how a jury view of the entire vehicle would have furthered the jury's understanding of the issues or served any legitimate purpose. On this record, there is no basis to conclude the trial court's denial of Kia's request was unreasonable, arbitrary, and without reference to guiding rules and principles. *See Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985). Kia's complaint about the jury view is overruled.

Having concluded the trial court did not err in the admission or exclusion of any of the evidence about which Kia complains, Kia's third and fourth issues are overruled.

### Jury Deliberations

On its first attempt to return a verdict, the jury purportedly found that Kia was negligent and Ruiz was not, but the jury's certificate and polling showed that only nine of the twelve jurors agreed with those answers. The trial judge stated, "Unfortunately, I cannot accept your verdict. You're going to need to go back and continue your deliberations until you reach a verdict in this case." Consequently, the jury resumed its deliberations.

In the second attempted verdict, although there was no unanimous finding of negligence and the jury had been instructed to only answer the question of gross negligence upon a finding of negligence, the jury found Kia was grossly negligent and awarded $1.2 million in punitive damages. Because the jury certificate did not show whether the jury was unanimous in these findings, the court instructed them to continue deliberating. To this end, the trial judge stated "I hate to do this, and I know some of you guys got to go. I'm going to send you back for additional deliberations. So I think you know what to do, guys, right?"

In the third attempted verdict, the certificate stated that the jury was unanimous on the questions concerning gross negligence and the amount of punitive damages, and eleven of the twelve agreed that Kia was negligent and Ruiz was not. Polling showed, however, that the jury was not unanimous as to gross negligence and punitive damages, and eleven jurors did not agree that Ruiz was not negligent. When the judge announced that he would have to send the jury back for further deliberations, one juror exclaimed "F–K." After the trial judge told the jury to listen very carefully, he read the portion of the charge "instructing the jury that unless otherwise

instructed, a question could be answered by ten or more of them, as long as it was the same group of ten." When the judge inquired if anyone needed for him to read the section again, one juror responded affirmatively. So the judge read the instruction again. Then the judge read the predicate to the gross negligence question instructing that the question be answered only upon a unanimous finding of negligence. Kia requested a supplemental instruction telling the jury they had done nothing wrong and not to return a verdict just to appease the court, but the instruction was denied. The trial judge told the jury he was sending them back for additional deliberations and stated, "Guys, if you want to, you can come back on Monday. I know some of you have to leave. Do you want to come back on Monday?" When one of the jurors inquired, "What about Friday?" the court stated:

> I'm sorry. Today's Thursday, so you can come back tomorrow. You guys want to talk about that? I don't want to commit you. If you guys want to talk about that and come back tomorrow, you're welcome to do that as well.

The jury left early, and returned a verdict the following day. In this verdict, the gross negligence question was answered "yes," although the jury certificate and polling showed the jury was not unanimous in finding negligence. When the court accepted the verdict over Kia's objection, the jury applauded.

■ In its fifth issue, Kia complains about the manner in which the trial court handled the jury's confusion during deliberations. In particular, Kia argues the trial court abused its discretion in refusing Kia's requested supplemental instruction and in refusing to poll the jury individually on each question in the charge before accepting the verdict. Having reviewed the record, we conclude Kia's arguments are without merit.

Kia claims the supplemental instruction it requested was necessary to "counteract the effect of the [judge's] coercive statements." Contrary to Kia's assertion, however, we view the trial judge's commentary as accommodating rather than coercive. Moreover, there is nothing to suggest Kia's supplemental instruction would have been helpful or was otherwise required.

■ When the jury attempted to return a defective verdict, the trial court properly directed that it be reformed. *See* TEX.R. CIV. P. 295; *see also Fish v. Dallas Indep. Sch. Dist.,* 170 S.W.3d 226, 229 (Tex.App.-Dallas 2005, pet. denied). Significantly, the jury never indicated it was deadlocked. Instead, the attempted verdicts and polling demonstrates there was confusion as to the application of certain instructions. Consequently, the judge gave the jury supplemental instructions by simply re-reading those portions of the charge that seemed to be the source of the confusion. Supplemental instructions that re-state proper, unobjected-to instructions from the charge are neither coercive nor error. *See Stevens v. Trav. Ins. Co.,* 563 S.W.2d 223, 231 (Tex.1978).

Viewed in its proper context, the trial judge's reference to the continuation of deliberations on Monday was not intended to be threatening or coercive. As the trial judge stated on the record after the jury retired for further deliberation, he was simply confused about whether the day in question was Thursday or Friday. Because "[o]ur law does not contemplate that every jury will function properly," the trial court has "broad discretion ... in administering the fact finding process." *See Stevens,* 563 S.W.2d at 228. Having reviewed the deliberative process as a whole, we cannot conclude the trial court erred in refusing Kia's supplemental instruction.

 Similarly, Kia has not demonstrated the trial court erred in refusing to poll the jurors individually as to each question in the charge. The right to have the jury polled is absolute and the trial court has no discretion in the matter once a request is made. *See* Tex.R. Civ. P. 294; *Pate v. Texline Feed Mills, Inc.*, 689 S.W.2d 238, 243 (Tex.App.-Amarillo 1985, writ ref'd n.r.e.). But the rule does not mandate polling in the manner Kia requested. *See* Tex.R. Civ. P. 294. Instead, the rule requires the trial court to read the questions and answers consecutively and then call the name of each juror separately to ask the juror if it is his or her verdict. *See id.* The purpose of the poll is to allow the jurors the opportunity, under protection of the court, to express their true convictions. *See Branham*, 925 S.W.2d at 368. In the present case, the trial judge polled the jury in accordance with the rule, and each juror affirmatively stated that the verdict was his or her verdict. There is nothing to suggest the final certificate was inaccurate. Consequently, there is no basis to conclude the trial court erred in refusing to do more than that which the rules of civil procedure and that which the trial judge, in the exercise of his discretion, deemed the circumstances required. Kia's fifth issue is overruled.

### Cumulative Error

 In its sixth issue, Kia asserts that if the claimed errors in issues three, four, and five were not harmful in and of themselves, the errors combined to cause harmful error. "Multiple errors, even if considered harmless taken separately, may result in reversal and remand for new trial if the cumulative effect of such errors is harmful." *Jones v. Lurie*, 32 S.W.3d 737, 745 (Tex.App.-Houston [14th Dist.] 2000, no pet.). To show cumulative error, an appellant must show that, based on the record as a whole, but for the alleged errors, the jury would have rendered a verdict favorable to it. *See Town East Ford Sales, Inc. v. Gray*, 730 S.W.2d 796, 810 (Tex.App.-Dallas 1987, no writ). Because we have concluded there was no error, it necessarily follows that there was no cumulative error. Kia's sixth issue is overruled.

### Exemplary Damages

 The jury found negligence against Kia by an 11–1 vote. Then, despite an instruction conditioning the gross negligence question on a unanimous finding of negligence, the jury answered the gross negligence question and unanimously found the harm to Andrea Ruiz resulted from Kia's grossly negligent acts or omissions. Because the jury was not unanimous in finding negligence, the trial court disregarded the punitive damage findings and entered a take-nothing judgment on punitive damages.

In a cross-point, Ruiz asserts the trial court erred by refusing to include the $2.5 million exemplary damage award in the judgment against Kia. Kia responds that the trial court properly denied the recovery of punitive damages because any such recovery requires a unanimous finding on the underlying theory of liability.

The basis for an award of punitive damages is set forth in Tex. Civ. Prac. & Rem. Code Ann. § 41.003 (West Supp.2010). The statute provides that punitive damages may be awarded upon clear and convincing evidence of fraud, malice, or gross negligence. Tex. Civ. Prac. & Rem.Code Ann. § 41.003(a). The statute further provides that "[e]xemplary damages may be awarded only if the jury was unanimous in regard to finding liability for and the amount of exemplary damages." Tex. Civ. Prac. & Rem.Code Ann. § 41.003(d).

The Texas Rules of Civil Procedure also prescribe the circumstances under which exemplary damages may be recovered. Specifically, TEX.R. CIV. P. 226a provides, in pertinent part:

> If exemplary damages are sought against a defendant, the jury must unanimously find, with respect to that defendant, (i) liability on at least one claim for actual damages that will support an award of exemplary damages; (ii) any additional conduct, such as malice or gross negligence ... and (iii) the amount of exemplary damages to be awarded.

*See also Deatley v. Rodriguez*, 246 S.W.3d 848, 849 (Tex.App.-Dallas 2008, no pet.) (affirming take-nothing judgment on exemplary damages where jury finding on underlying theory of liability not unanimous).

Ruiz contends the phrase in section 41.003 "finding liability for" requires only a unanimous finding of gross negligence, while rule 226a requires unanimous findings of both negligence and gross negligence. Thus, Ruiz claims the statute and the rule conflict, and in the case of such a conflict, the statute controls.

Ruiz provides no authority to support the strained interpretation he seeks to advance. When construing a statute, however, we presume the Legislature intended a "just and reasonable result." *See* TEX. GOV'T CODE ANN. § 311.021(3) (West 2005). We also use definitions prescribed by the Legislature and any technical or particular meaning the words in the statute have acquired. *See City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex.2008). Otherwise, we construe the statute's words according to their plain and common meaning, unless a contrary intention is apparent from the context or such a construction leads to absurd results. *Id.* at 625–26.

 Within this framework, we note the well-established principle that the recovery of punitive damages requires a finding of an independent tort with accompanying actual damages. *See Fed. Express Corp. v. Dutschmann*, 846 S.W.2d 282, 284 (Tex.1993). Moreover, a defendant cannot be grossly negligent without being negligent. *See J.P. Morgan Chase Bank, N.A. v. Tex. Contract Carpet, Inc.*, 302 S.W.3d 515, 535 (Tex.App.-Austin 2009, no pet.). In light of these principles, it is logical to conclude the Legislature intended the unanimity requirement to apply to all of the elements necessary to establish a right to recover punitive damages. Requiring the jury to unanimously "find liability for" exemplary damages necessarily includes a finding on the underlying theory of liability. Thus, there is no conflict between the statute and rule 226a. Because the verdict was not unanimous with regard to the underlying theory of liability, the trial court did not err in refusing to award exemplary damages. *See Deatley*, 246 S.W.3d at 849. Ruiz's cross-point is overruled.

## CONCLUSION

Having overruled Kia's issues and Ruiz's cross point, we affirm the trial court's judgment.